# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2848-19

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

T.C., and A.V.,

     Defendants,

and

J.L.,

     Defendant-Appellant.

_____

IN THE MATTER OF L.V.,
K.L., and A.L., Minors.

_____

Submitted May 18, 2021 – Decided June 14, 2021

Before Judges Yannotti and Haas.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Hudson County, Docket No. FN-09-0211-18.

Joseph E. Krakora, Public Defender, attorney for appellant (Richard Foster, Assistant Deputy Public Defender, of counsel and on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Sookie Bae, Assistant Attorney General, of counsel; Julie B. Colonna, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Melissa R. Vance, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

J.L. appeals from an order entered by the Family Part on December 17, 2018, which found that he sexually abused his stepdaughter L.V. on multiple occasions and abused or neglected his two children, K.L. and A.L., by placing them at substantial risk of harm. We affirm.

I.

In November 2016, L.V., who was then eight years old, was living with her mother T.C., J.L., and two younger stepsisters, A.L. and K.L. L.V.'s birth father is A.V., who was at the time in the military and stationed in North Carolina. On November 6, 2016, the Division of Child Protection and

2

Permanency (Division) received a referral from the Jersey City police, indicating that L.V. had reported to her paternal aunt P.V. that J.L. had been sexually abusing her in the previous two years.

The Division assigned two of its workers to investigate. They met the police, T.C., L.V., and other family members at a hospital in Jersey City. On November 6, 2016, the Special Victims Unit (SVU) of the Hudson County Prosecutor's Office (HCPO) later conducted interviews of L.V., J.L., and others. L.V. told the investigators that J.L. had repeatedly assaulted her sexually. She explained that his "private part" touched her "private part."

L.V. stated that at times, J.L. would touch her "butt" with his penis. Sometimes his penis would touch her body on top of her clothes, and at other times on her skin. She said that whenever these incidents occurred, no one else was around. L.V. stated that J.L.'s penis did not touch any other part of her body, and she did not touch his penis with her mouth.

J.L. denied sexually abusing L.V. When he was asked to explain what happened, J.L. responded:

> [S]he probably took it wrong, I guess. Sometimes we all laying down with my daughters, it looked to me like I [was] trying to touch her, but sometimes, you know, how you hug, . . . to like give them love. . . . So, I guess . . . I don't know how she took it. But it's not like I was on her and stuff like that, but, yeah, we was just laying

3

down. [T.C.] was in the living room. And[] then, I . . . just don't understand how [could] be doing stuff when . . . her mom is around . . . [w]e was just laying down, you know? It's not like I can just do stuff. . . . We was just watching TV, laying down, you know, the girls is running around. But . . . that doesn't mean that I'm touching her.

J.L. asserted that L.V. probably "took it" the wrong way. He said he was not calling L.V. a liar. He stated that he hugged L.V. while they were laying together on his bed, but he did not know "how she took it." He also stated that when L.V. moved, "she rubbed, but that doesn't mean she . . . had [his penis] in her hand . . . ." Initially, J.L. said L.V. always wore underwear when he hugged her, but he stated later that sometimes she was not wearing a shirt or panties.

J.L. explained that he would wear a robe over loose underwear and there were holes in his underwear. He denied that his penis fell out of his underwear, but he "guess[ed]" that L.V. saw his penis when he sat down because his underwear was "short." He stated that whenever he lay on the bed with L.V., he tried to pull his robe over his underwear.

The Division thereafter implemented a safety protection plan, which barred J.L. from the family home until it completed its investigation. The Division also arranged for L.V. to be evaluated and receive counseling at Audrey

4

Hepburn Children's Hospital (AHCH). J.L. was allowed supervised visitation with K.L. and A.L.

In November 2016, the Division found that the allegations of abuse or neglect of K.L. and A.L. had not been substantiated, but the allegations that J.L. sexually abused L.V. were substantiated. The HCPO closed its case, without bringing any criminal charges against J.L.

In December 2016, Dr. Patricia Sermabeikian, social work supervisor at AHCH, performed a psychosocial evaluation of L.V. Dr. Sermabeikian and Dr. Anthony V. D'Urso, supervising psychologist at AHCH, issued a report dated February 22, 2017. They found that sexual abuse was clinically supported and L.V. was suffering from Post-Traumatic Stress Disorder (PTSD).

Dr. Sermabeikian and Dr. D'Urso recommended that L.V. receive sexual abuse specific treatment "so that she can process the sexual abuse experiences, learn protective and coping skills and how to address her symptoms and triggers." They stated that L.V.'s mother would benefit from being involved in the treatment and recommended that L.V. have no contact with J.L.

In addition, in January 2017, Dr. Paulett Diah at AHCH conducted a medical evaluation of L.V. The Division's worker informed Dr. Diah that L.V. had recently begun to question whether the sexual assaults she had reported were

5

real or a dream. In her report, which is dated February 14, 2017, Dr. Diah stated that the physical examination neither confirmed nor denied the possibility of sexual abuse. She said L.V. should be referred for a psychosocial evaluation to assess any emotional trauma she might have sustained due to the reported sexual abuse.

Thereafter, the Division referred L.V. for sexual abuse therapy. In November 2017, the therapy provider reported to the Division that L.V. was afraid to go home. According to the provider, L.V. said J.L. had been in the family home. L.V. also said her mother was making her recant her statements about J.L. and would hit her after therapy. She then denied that J.L. had sexually abused her.

The Division investigated the report and learned that J.L. had been in the home, despite the restrictions the Division had previously imposed. T.C. signed a new safety protection plan and again agreed to restrictions on J.L.'s contact with the children.

On December 27, 2017, the Division filed a verified complaint for care and supervision of all three children under N.J.S.A. 9:6-8, N.J.S.A. 30:4C-12 and Rule 5:12-1 to -7. In the complaint, the Division alleged that all three

children were abused or neglected. The complaint included the allegations that J.L. sexually abused L.V.

The trial court entered an order dated January 9, 2018, granting the Division's application for care and supervision. The court barred J.L. from having any contact with L.V. and required supervision of his contacts with K.L. and A.L. The court thereafter entered orders which provided, among other things, that the children would remain under the Division's care and supervision.

The Division referred L.V. for a second evaluation at AHCH, which began in April 2018. AHCH's evaluation was scheduled to be completed in September 2018, but it was delayed because Dr. Sermabeikian was unexpectedly unavailable.

The evaluation continued in October 2018 and was completed later that month. During the evaluation, L.V. stated that her mother told her the allegations of sexual abuse were a dream. However, L.V. insisted that J.L. had touched her, as she stated previously. She told the evaluator, "I think it was real. I told you."

In September 2018, J.L. had a parenting evaluation at AHCH. The report of the evaluation was signed by Dr. Kirsten Byrnes, a staff psychologist at AHCH, and Dr. D'Urso. The report recommended that J.L. be referred to

therapy "with someone who specializes in treating parents who have engaged their children in sexual contact." The report stated that J.L. had to process L.V.'s disclosures, the impact the Division had had on the family, and "develop an appropriate safety plan to prevent any future abuse."

Judge Lois Lipton conducted a fact-finding hearing on the Division's abuse and neglect allegations, which began in October 2018. At the hearing, the Division presented testimony from Division workers Olivia Ahumada and Francisco Monterrosa, who detailed the Division's involvement with the family and the investigation of L.V.'s allegations.

The Division also presented the videos of the HCPO's interviews, including the videos of the interviews with L.V. and J.L. In addition, the Division presented expert testimony by Dr. D'Urso. The parties presented no other witnesses.

During the hearing, J.L. moved to dismiss the complaint on the ground that the Division had not yet furnished the report from L.V.'s recent evaluation at AHCH, and the Division had not presented sufficient evidence to support its claim of abuse or neglect regarding K.L. and A.L. The judge denied the motion.

The Division then served the report from L.V.'s second evaluation at AHCH, which is dated October 24, 2018, and signed by Dr. Sermabeikian and

Dr. D'Urso. The report stated that sexual abuse was clinically supported, and L.V. was again diagnosed with PTSD. Dr. Sermabeikian and Dr. D'Urso recommended, among other things, that L.V. receive sexual abuse specific treatment "so that she can process her sexual abuse experiences, address her feelings and issues related to her recantations and reaffirmations of the sexual abuse."

When the hearing resumed in November 2018, the Division presented expert testimony by Dr. D'Urso. He explained that the purpose of a psychosocial evaluation is to assess, diagnose, and provide a treatment plan for the individuals and families involved. He pointed out that AHCH does not make credibility assessments.

Dr. D'Urso discussed L.V.'s initial evaluation at AHCH in 2016 and her reevaluation in 2018. He testified that L.V. had provided "idiosyncratic detail," which indicated that she actually experienced what she described. He said that L.V.'s responses about needing to push away involuntary thoughts about the incidents were consistent with PTSD.

The doctor also stated that a child's inconsistent statements over time is referred to as "piecemeal disclosure." He explained that a child is not likely to give an interviewer every incident that occurred in one immediate narrative. The

9

child might provide somewhat different responses to different interviewers over time.

Dr. D'Urso further testified that the incidents that L.V. described were the "core of the evaluation," and L.V. did not deviate from her allegations. He noted that before the second evaluation, L.V. had expressed some uncertainty as to whether the incidents were real or a dream. He opined, however, that this was not a recantation of the allegations because the investigation had not been completed.

Dr. D'Urso stated that during the second evaluation, L.V. reaffirmed her allegations of sexual abuse. He said L.V. had distinguished between a dream and being told that it was a dream. He noted that L.V. had stated quickly and spontaneously that her described experiences were not a dream.

Dr. D'Urso further testified that J.L.'s denials of sexual abuse did not affect the AHCH's clinical conclusions because the opinion was largely based on L.V.'s disclosures. He noted that a person accused of sexual abuse typically denies such allegations.

On December 17, 2018, Judge Lipton issued an oral decision, finding that J.L. had sexually abused L.V. on several occasions. The judge further found that J.L. abused or neglected K.L. and A.L. The judge noted that the evidence

showed K.L. and A.L. were in and out of the bedroom where J.L. was sexually abusing L.V. The judge found that this placed K.L. and A.L. at substantial risk of harm.

Judge Lipton memorialized her findings in an order dated December 17, 2018. Thereafter, the trial court conducted compliance review hearings and on February 4, 2020, entered an order terminating the litigation. This appeal followed.

## II.

On appeal, J.L. argues that the trial court's finding that he sexually abused L.V. should be reversed because the Division failed to present sufficient evidence to corroborate L.V.'s out-of-court statements.

A trial judge's fact-findings will be upheld on appeal if they are "supported by adequate, substantial, and credible evidence." N.J. Div. of Child Prot. & Permanency v. B.H., 460 N.J. Super. 212, 218 (App. Div. 2019) (quoting N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 552 (2014)). "We 'accord deference to fact[-]findings of the family court because it has the superior ability to gauge the credibility of the witnesses who testify before it and because it possesses special expertise in matters related to the family.'" Ibid. (quoting N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448 (2012); see also N.J.

11

Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008) (the trial judge "has a 'feel of the case' that can never be realized by a review of the cold record")).

However, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." R.G., 217 N.J. at 552-53 (quoting Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)). If the trial court's rulings "'essentially involved the application of legal principles and did not turn upon contested issues of witness credibility,' we review the court's corroboration determination de novo." N.J. Div. of Child Prot. & Permanency v. A.D., 455 N.J. Super. 144, 156 (App. Div. 2018).

Under N.J.S.A. 9:6-8.21(c), an abused or neglected child is a child whose parent or guardian:

> (3) commits or allows to be committed an act of sexual abuse against the child; (4) or a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian . . . to exercise a minimum degree of care . . . (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof . . . .
>
> [Ibid.]

Sexual abuse is defined as "contacts or actions between a child and a parent or caretaker for the purpose of sexual stimulation of either that person or another person." N.J.S.A. 9:6-8.84. Sexual abuse includes: "a. the employment, use, persuasion, inducement, enticement, or coercion of any child to engage in, or assist any other person to engage in, any sexually explicit conduct or simulation of such conduct; b. sexual conduct including molestation, prostitution, other forms of sexual exploitation of children, or incest . . . ." N.J.S.A. 9:6-8.84(a).

To establish abuse or neglect under Title Nine, the Division must show by a preponderance of the "competent, material and relevant evidence" that the child is "abused or neglected." N.J.S.A. 9:6-8.44; N.J.S.A. 9:6-8.46(b). "Such evidence may include 'any writing [or] record . . . made as a memorandum or record of any condition, act, transaction, occurrence or event relating to a child in an abuse or neglect proceeding of any hospital or any other public or private institution or agency,'" as long as it meets requirements for admissibility "akin to the business records exception." N.J. Div. of Youth & Fam. Servs. v. P.W.R., 205 N.J. 17, 32 (2011) (quoting N.J.S.A. 9:6-8.46(a)(3)) (citing N.J. Div. of Youth & Fam. Servs. v. M.C. III, 201 N.J. 328, 346-47 (2010)).

At the hearing, the Division submitted L.V.'s out-of-court statements as shown in her videotaped interview at the HCPO and recorded by the clinical evaluators at AHCH. The judge noted that N.J.S.A. 9:6-8.46(a)(4) provides in pertinent part that: "previous statements made by the child relating to any allegations of abuse or neglect shall be admissible in evidence; provided, however, that no such statement, if uncorroborated, shall be sufficient to make a fact finding of abuse or neglect."

"A child's statement need only be corroborated by '[s]ome direct or circumstantial evidence beyond the child's statement itself.'" A.D., 455 N.J. Super. at 157 (quoting N.J. Div. of Child Prot. & Permanency v. N.B., 452 N.J. Super. 513, 522 (App. Div. 2017)). "[C]orroboration of child sexual abuse does not have to be 'offender-specific,' because '[i]t would be a rare case where evidence could be produced that would directly corroborate the specific allegation of abuse between the child and the perpetrator . . . .'" Ibid. (quoting N.J. Div. of Youth & Fam. Servs. v. Z.P.R., 351 N.J. Super. 427, 435 (App. Div. 2002)).

"The most effective types of corroborative evidence may be eyewitness testimony, a confession, an admission or medical or scientific evidence." Ibid. (quoting N.J. Div. of Youth & Fam. Servs. v. L.A., 357 N.J. Super. 155, 166

14                                                                                    A-2848-19

(App. Div. 2003)). Such indirect evidence has included "a child victim's precocious knowledge of sexual activity, a semen stain on a child's blanket, a child's nightmares and psychological evidence." N.J. Div. of Child Prot. & Permanency v. I.B., 441 N.J. Super. 585, 591 (App. Div. 2015) (quoting Z.P.R., 351 N.J. Super. at 436). Evidence of "age-inappropriate sexual behavior" can also provide the necessary corroboration required under N.J.S.A. 9:6-8.46(a)(4). Z.P.R., 351 N.J. Super. at 436.

On appeal, J.L. argues that there was insufficient corroboration for L.V.'s out-of-court statements. He contends the trial court erred by holding that AHCH's findings provided corroboration for L.V.'s statements. He argues that the finding by the Division's consultants that the sexual abuse was "clinically supported" improperly "recast[ed]" a therapeutic conclusion as a de facto credibility finding by a witness, which the court improperly adopted.

However, as Judge Lipton found, the Division presented sufficient evidence to corroborate L.V.'s out-of-court statements regarding the sexual abuse, as shown in the video of the interview at the HCPO and recounted to the clinical evaluators at AHCH. The judge noted that L.V. provided consistent statements concerning the sexual abuse.

A-2848-19

As noted previously, L.V. had described the incidents as having occurred while she was lying in bed with J.L. She stated that J.L. had been wearing shorts or a robe, which J.L. confirmed. She also stated that J.L.'s "privates" had touched various parts of her body, including her buttocks. The judge observed that in her 2018 reevaluation at AHCH, L.V. reaffirmed her statements about the sexual abuse and stated that it was not a dream.

The judge further found L.V.'s statements were corroborated by Dr. D'Urso's expert testimony. He stated that inconsistencies due to piecemeal disclosures are typical for children who have suffered trauma. He noted that L.V. had experienced the sexual abuse at age eight, and the diagnosis of PTSD was appropriate and consistent with L.V.'s symptoms, which included emotional distress, anger, and sadness. Dr. D'Urso explained that such symptoms are typical of persons who have experienced sexual abuse.

Judge Lipton noted that Dr. D'Urso had testified that he did not believe L.V. had recanted her allegations. He stated that L.V. had disavowed comments she may have made indicating she may have dreamed the incidents. The judge found that any recantation by L.V. of her allegations was not credible.

Moreover, J.L.'s statements during his interview at the HCPO also corroborated L.V.'s out-of-court statements. He admitted he would lay on his

A-2848-19

bed with L.V. to watch television, and he would do so in loose, short underwear. He also wore a robe that he used to try to cover his underwear.

J.L. also admitted that he had hugged L.V. and asserted that she had taken it "the wrong way." He acknowledged that during these incidents, L.V. had the opportunity to see his exposed penis. He noted that at times, L.V. was in her underwear and sometimes was not wearing a shirt or underwear.

Thus, there is sufficient credible evidence in the record to support the trial court's finding that J.L. sexually abused L.V. The Division presented sufficient evidence to corroborate L.V.'s out-of-court statements indicating that J.L. sexually abused her on numerous occasions.

J.L. further argues that AHCH's findings were improperly conveyed through Dr. D'Urso's testimony. He also contends the judge erred by considering L.V.'s disclosures about what had happened to her "over a course of time to various individuals."

We are convinced that these arguments lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E). We note, however, that Dr. D'Urso is the supervising psychologist at AHCH, and he reviewed and signed the evaluation reports. Dr. D'Urso had sufficient knowledge and experience to testify regarding the findings in AHCH's evaluation reports.

In addition, Dr. D'Urso testified that AHCH did not make finding as to whether L.V.'s allegations were credible. AHCH determined based on L.V.'s statements and its forensic analysis, that there was clinical support for sexual abuse. Furthermore, the trial judge viewed the video of L.V.'s statements, considered the related forensic evidence, and made her own assessment of L.V.'s credibility.

## III.

Next, J.L. argues he was denied due process and fundamental fairness because the Division's corroborative evidence was "so tainted as to be worthless" and the judge erred by "not requiring more." He argues that the Division's evidence of corroboration was not sufficiently reliable.

J.L. contends the judge should not have admitted the video of L.V.'s interview into evidence, because this denied him of his right to cross-examination. He contends the trial court should have taken L.V.'s testimony in camera pursuant to Rule 5:12-4(b). He asserts the judge improperly limited her assessment of L.V.'s credibility to her videotaped interview and the AHCH's findings.

We note that although "due process guarantees civil litigants a measure of confrontation[,]" it is also a matter of public policy "to prevent further

18

victimization or traumatization of young children called to testify in court proceedings." N.J. Div. of Child Prot. & Permanency v. C.W., 435 N.J. Super. 130, 142 (App. Div. 2014) (quoting A.B. v. Y.Z., 184 N.J. 599, 604 (2005)). Rule 5:12-4(b) provides in pertinent part that, "In the child's best interests, the court may order that a child not be present at a hearing or trial unless the child's testimony is necessary for the determination of the matter." The Rule further provides that, "The testimony of a child may, in the court's discretion, be taken privately in chambers or under such protective orders as the court may provide." Ibid.

Here, the Division informed the judge it intended to present five video tapes of interviews, and J.L.'s counsel indicated she was not objecting to the videos of the interviews of J.L. and L.V. However, even if his attorney had objected to the admission of the video of L.V.'s interview, there was no legitimate basis for such an objection.

Here, the judge was not required to compel L.V. to testify, even in camera. Given L.V.'s age, her diagnosis of PTSD, and the evidence that she was suffering emotional distress and other symptoms, compelling her testimony, even in private, would undoubtedly have resulted in further victimization and traumatization. Furthermore, a court has the discretion under N.J.S.A. 9:6-

8.46(a) to admit out-of-court statements by child-victims of sexual abuse, and J.L. had a sufficient opportunity to challenge the credibility of L.V.'s statements.

J.L. also contends L.V.'s testimony was necessary given the length of time between the initial allegations and the fact-finding hearing. The record shows, however, that the hearing was delayed in part by the need to have L.V. reevaluated and Dr. Sermabeikian's unanticipated unavailability. The judge found that the Division had pursued the matter with diligence. The record supports that finding.

In support of his argument that he was denied due process and fundamental fairness, J.L. relies upon New Jersey Division of Youth and Family Services v. P.C., 439 N.J. Super. 404 (App. Div. 2015). In that case, the court reversed a finding of abuse or neglect because the trial court had determined, sua sponte, that the defendant mother should be the subject of the abuse or neglect proceedings against the father, even though the Division had not included any allegations against the mother in its complaint. Id. at 413.

J.L.'s reliance upon P.C. is misplaced. Here, the Division found that the allegations that J.L. sexually abused L.V. were substantiated, and its verified complaint set forth its allegations of sexual abuse. Thus, P.C. does not support J.L.'s contention that he was denied due process and fundamental fairness.

A-2848-19

Accordingly, we reject J.L.'s assertion that the judge erred by failing to compel L.V. to testify at the fact-finding hearing. We also reject J.L.'s assertion that the Division's evidence was legally insufficient to corroborate L.V.'s out-of-court statements regarding the sexual abuse. We conclude J.L. was not denied due process and fundamental fairness in the fact-finding proceeding.

## IV.

J.L. also contends there is insufficient evidence in the record to support the court's finding that he abused or neglected K.L. and A.L. He contends the Division failed to present specific evidence to establish that K.L. and A.L. were put in imminent danger or substantial risk of harm by his acts or omissions.

As noted above, N.J.S.A. 9:6-8.21(c)(4)(b) defines an abused or neglected child as one:

> whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian . . . to exercise a minimum degree of care . . . in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof . . . .

> [Ibid.]

A parent or guardian "fails to exercise a minimum degree of care when he or she is aware of the dangers inherent in a situation and fails adequately to

supervise the child or recklessly creates a risk of serious injury to that child."

G.S. v. Dep't of Hum. Servs., 157 N.J. 161, 181 (1999). A court need not wait to act until a child is actually or irreparably impaired by parental inattention or neglect. N.J. Div. of Youth & Fam. Servs. v. S.S., 372 N.J. Super. 13, 24 (App. Div. 2004).

In her oral decision, Judge Lipton noted the evidence showed that, while J.L. was sexually abusing L.V. on his bed, K.L. and A.L., would enter and exit the bedroom, and there was a substantial risk these two children would observe the sexual abuse of L.V. The judge stated that J.L. had acted recklessly and created a serious risk of substantial harm to both children. The judge therefore found that K.L. and A.L. were abused or neglected children under N.J.S.A. 9:6-8.21(c)(4)(b).

We are convinced there is sufficient credible evidence in the record to support the judge's finding. As the Law Guardian notes, a parent who sexually abuses one child may very well sexually abuse another child. Moreover, a parent's conduct as to one child may be considered as creating a risk of harm to another child. N.J. Div. of Youth & Fam. Servs. v. I.H.C., 415 N.J. Super. 551, 573 (App. Div. 2010).

22

J.L. argues, however, that the Division's claim of abuse or neglect as to K.L. and A.L. failed as a matter of law because the Division did not present a psychologist or child abuse expert to testify as to the specific harm that might have befallen K.L. and A.L. due to their exposure to the "claimed" sexual abuse. We disagree.

Here, Dr. D'Urso testified that L.V. had consistently stated she had been sexually abused by J.L. He noted that she was suffering from PTSD and experiencing emotional distress, anger, sadness, and other symptoms typical of a child who has experienced sexual abuse. Dr. D'Urso did not testify as to the harms young children could suffer if they are exposed to the sexual abuse of another child.

However, the judge could reasonably infer, based on all the evidence in this case, that K.L. and A.L.'s exposure to J.L.'s sexual abuse of L.V. placed those children at substantial risk of harm. The judge could reasonably infer that the children's exposure to the sexual abuse of a sibling could be traumatic and these two children could experience symptoms similar to those experienced by L.V.

J.L. further argues that a young child's exposure to an objectionable, ill-advised, or even potentially harmful act does not establish abuse or neglect

23

under N.J.S.A. 9:6-8.21(c)(4)(b). In support of his argument, J.L. cites <u>New Jersey Division of Youth and Family Services v. V.T.</u>, 423 N.J. Super. 320 (App. Div. 2011).

In <u>V.T.</u>, the court found that a parent or caretaker's failure to comply with recommended drug treatment and positive tests for cocaine and marijuana at two supervised visits did not "inherently" create a substantial risk of harm to a child. <u>Id.</u> at 330. The court noted that the Division had not presented expert evidence showing that the parent was impaired to the point of posing a risk to the child in a supervised setting. <u>Id.</u> at 331.

However, the failure to comply with drug treatment and the use of illegal substances during supervised visitation is not comparable to sexual abuse of a child by a parent, in the family home. Thus, <u>V.T.</u> has no application to this matter.

J.L. also cites <u>New Jersey Division of Child Protection and Permanency v. R.W.</u>, 438 N.J. Super. 462 (App. Div. 2014). There, the defendant parent used marijuana on one occasion, while accompanied by her child. <u>Id.</u> at 464. We reversed the trial court's finding of abuse or neglect, finding that the evidence was legally insufficient to show the parent had placed the child in imminent danger or at substantial risk of harm. <u>Ibid.</u>

A-2848-19

J.L.'s reliance upon <u>R.W.</u> is misplaced. Sexual abuse of an eight-year-old child, on several occasions, in the family home, where other young children could observe the sexual abuse, is not comparable to the use of marijuana on one occasion.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-2848-19